DISTRICT COURT
DENVER, COLORADO

ORIGINAL _____M

2021 MAR -3  AM 9: 31

DATE FILED: March 3, 2021
CASE NUMBER: 2021CV86

Howard Lee
500 Castano Street
St. Augustine, FL 32086
*in propria persona*
+1 512 574 0159

# COLORADO DISTRICT COURT

# IN AND FOR THE CITY AND COUNTY OF DENVER

HOWARD LEE

Plaintiff,

vs.

EQUITY TRUST COMPANY;

Defendant

+ DOES 1 to 25

Case No.   21CV86 -260

**PLAINTIFF'S [AMENDED] COMPLAINT FOR NEGLIGENCE; BREACH OF FIDUCIARY DUTY; WRONGFUL FILING OF AN INFORMATION RETURN; AIDING AND ABETTING FIDUCIARY BREACH; NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS; FRAUDULENT MISREPRESENTATION; and FRAUDULENT OMISSION; and also requesting DECLATORY RELIEF**

Plaintiff Howard Lee ("Lee"), proceeding *pro se*, complains of Defendant Equity Trust Company ("ETC") and in support of his complaint, the Plaintiff states as follows:

## The Parties: Plaintiff and Defendants

1.        The Plaintiff, Howard Lee, is a 65-year-old individual presently residing in St. Augustine, Florida.

2.        Defendant Equity Trust Company ("Equity Trust" or "ETC") is a state-chartered non-depository trust company regulated by the South Dakota Division of Banking, with its principal place of business in Ohio, and offices in Colorado (in Denver) and South Dakota.

## Further allegations regarding conspiracy between defendants

3.      Upon information and belief, there are even more nefarious corporate, trust, and other entity type Defendants beyond ETC involved in these conspiracies, currently unknown to Plaintiff. They shall emerge with the benefit of legal discovery.

**PLAINTIFF'S [AMENDED] LEGAL COMPLAINT FOR NEGLIGENCE; BREACH OF FIDUCIARY DUTY; WRONGFUL FILING OF AN INFORMATION RETURN; FRAUDULENT MISREPRESENTATION; AIDING AND ABETTING FIDUCIARY BREACH; FRAUDULENT OMISSION; and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

1

4. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, any and all such corporate entities, along with ETC, in addition to acting for itself and for its own behalf, was acting as the agent, servant, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the Defendants (entity and individual) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

5. Plaintiff further alleges on information and belief that the acts of each of the Defendants were fully ratified by each and all of the Defendants. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

6. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, any as-yet-unnamed individual DOES, in addition to acting for himself, herself and/or on their own behalf individually, as well as for the benefit of their respective marital community (if any), is and was acting as the agent, servant, employee, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the other Defendants (individual and entities) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

7. Plaintiff further alleges on information and belief that the acts and non-acts of each of the Defendants were fully ratified by each and all of the other Defendants.

8. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

**Jurisdiction and Venue**

9. This Court is an appropriate venue as ETC has a continuous and systemic presence in Colorado, and thus this Court can assert general personal jurisdiction over Defendant ETC.

**Underlying Facts and Narrative**

10. In 2007, when the Plaintiff, Mr. Howard Lee, was 51, the Plaintiff wished to make two investments with his Self-Directed IRA. Each of the two investments was a set of residential lots (real property) in residential developments in Nicaragua.

11. After hiring ETC as his new Self-Directed IRA Custodian, Mr. Lee wired US $736,000 to ETC, including one wire of $516,000 which was a rollover/transfer from his former IRA account at Fidelity (via a Schwab rollover account), made on or around August 28th, 2007 (Exhibit C).

12. The $736,000 wired would cover two investments totaling $735,000, and about $1,000 of expected ETC fees.

PLAINTIFF'S [AMENDED] LEGAL COMPLAINT FOR NEGLIGENCE;      2
BREACH OF FIDUCIARY DUTY; WRONGFUL FILING OF AN
INFORMATION RETURN; FRAUDULENT MISREPRESENTATION;
AIDING AND ABETTING FIDUCIARY BREACH; FRAUDULENT OMISSION;
and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

13. The Plaintiff then instructed his self-directed IRA Custodian, Equity Trust, to handle these two investments for him, one for US $515,000 (seven (7) residential lots in a coastal development west of Managua named Montecristo), and one for US $220,000 (two lots in Seaside Mariana, also a residential development on the Nicaraguan coast). (Exhibit A, Sworn Affidavit of Howard Lee).

14. Combined, these two investments (totaling US $735,000) were 100% of the Plaintiff's IRA retirement savings, which he planned to use for his family and his retirement (Exhibit A).

15. Seaside Mariana was and is a mainly residential community in Nicaragua on what was originally a 923-acre parcel of raw, undeveloped land with 2 kilometers of beach.

16. Montecristo is an even larger development that was on the coast of Nicaragua as well, with 6 residential neighborhoods, and 8 kilometers of beach and ocean frontage.

17. The Plaintiff provided the contact information of the owners of each development (Kevin Fleming at Seaside Mariana and Lori Estrada at Montecristo, in each case also the sellers of the real estate investments), after he had agreed on pricing and real estate lots to be purchased with the sellers.

18. The Plaintiff requested that Equity Trust execute and complete the investments (each purchase of real estate lots for his self-directed IRA).

19. Mr. Lee trusted Equity Trust to do its job as his IRA custodian with at least minimal competency and professionalism and hoped for much more than that, given ETC's stewardship of Mr. Lee's entire Self-Directed Individual Retirement Account (Exhibit A).

20. Per its web site (Exhibit B), Equity Trust holds $28.7 billion of assets for clients.

21. ETC's supervision by the South Dakota Division of Banking qualifies it to be an asset custodian for individual retirement accounts ("IRAs") under Section 408 of the Internal Revenue Code. Traditional IRAs are funded with pre-tax contributions and gains and income are not taxed until distribution. *26 USC 408 (d) (1). e (1).*

22. ETC specializes as a custodian for self-directed IRA accounts or SIDRAs. ETC has at least 170,000 clients (Exhibit B).

23. A self-directed IRA custodian's duty to Mr. Lee for his investments for the benefit of his IRA would involve finalizing the draft contracts and executing them on behalf of Equity Trust Company IRA FBO Howard Lee, and then wiring monies to the selling organizations in exchange for freehold marketable title to the selected investment properties.

24. The custodian is – or is supposed to be – a responsible professional, or group of them, that holds the assets for the benefit of the client/customer's IRA, and the custodian administers the account. In the case of real assets with marketable title (real estate), the custodian also would (after ensuring that title had been properly transferred) hold and properly administer those real assets on behalf of the client's IRA as well.

25. Getting even more specific about the role for a custodian of self-directed IRAs like Equity Trust, self-directed IRA custodians like Equity Trust Company allow individuals to make their own investment decisions with their IRA funds. Investors looking for non-traditional investments can roll qualified pretax funds from a 401k or a pension plan into a self-directed IRA.

**PLAINTIFF'S [AMENDED] LEGAL COMPLAINT FOR NEGLIGENCE; BREACH OF FIDUCIARY DUTY; WRONGFUL FILING OF AN INFORMATION RETURN; FRAUDULENT MISREPRESENTATION; AIDING AND ABETTING FIDUCIARY BREACH; FRAUDULENT OMISSION; and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
3

26. Once the funds are in the IRA account, the investor directs the IRA custodian to purchase an investment, which is usually memorialized by a promissory note, a contract or shares of stock. Once a year the IRA custodian is supposed to contact the investment sponsor and ask for a value on the investment and will report that value to the IRS to ensure that the investor is not charged taxes on the investment.

27. For those customers of Equity Trust and other custodians, especially those with retirement investments and assets, having that custodian in place, that responsible professional, should ensure that their customers can sleep at night.

28. In the case of Mr. Lee, the Plaintiff, too, felt more safe and secure having a large company like Equity Trust administer the assets of his self-directed IRA (Exhibit A).

29. After Mr. Lee made the investment requests, ETC did not call or email Mr. Lee for many years.

30. The Plaintiff moved to Hong Kong in October 2007, secure in the knowledge (or so he thought) that his retirement was in good hands.

31. Costa Rica land, just to the South of Nicaragua, had gone up 1000% or more, and had become the vacation wonderland for a new generation of explorers, offering *pura vida* (pure life) experiences in nature.

32. Mr. Lee hoped that Nicaragua, with similar natural splendor, would follow a similar path. Indeed, Nicaraguan land is up hundreds of percent since 2007.

33. Having not heard anything from ETC, in 2008 Mr. Lee checked in with Lori Estrada (owner/seller of Montecristo, along with her husband Jorge Estrada) by email, and learned from Ms. Estrada that the Montecristo investment (US $515k) was completed.

34. Per Equity Trust records (received later), they wired the other US $220k to Seaside Mariana's account for the other investment Mr. Lee wanted to make through his self-directed IRA.

35. Mr. Lee then did not think much about his investments meant for his retirement, though he did follow market trends, including what was happening in Nicaragua, where land prices were indeed going up as expected.

36. Then, fast-forwarding another decade where Mr. Lee focused on his business opportunity and sought meaning personally, in 2019 Mr. Lee had an unexpected development.

37. To the Plaintiff's great surprise and shock, on October 21st, 2019, Mr. Lee received an alarming letter from the IRS (Exhibit D), which stated that Mr. Lee owed them US $381,496 in back tax and penalties from a 2017 distribution from Equity Trust (Exhibit E contains the 2020 IRS followup).

38. Apparently, Equity Trust, without the Plaintiff's request or authorization, had closed out his account, without any communication that the Plaintiff was aware of.

39. In late 2019, Mr. Lee got in touch with Equity Trust and found that they had indeed closed out his account and his self-directed IRA, and supposedly distributed the properties he had invested in.

40. Mr. Lee contacted Equity Trust many times between January 2020 through April 2020, to try to understand what had happened (Exhibit A).

**PLAINTIFF'S [AMENDED] LEGAL COMPLAINT FOR NEGLIGENCE;**    4
**BREACH OF FIDUCIARY DUTY; WRONGFUL FILING OF AN INFORMATION RETURN; FRAUDULENT MISREPRESENTATION; AIDING AND ABETTING FIDUCIARY BREACH; FRAUDULENT OMISSION; and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

41. However, most of the times that Mr. Lee called Equity Trust in the first four months of 2020, Mr. Lee was informed that ETC could not assist him because his account had been closed. For that stated reason, Equity Trust representatives, to Mr. Lee's surprise, would not cooperate in providing him any paperwork or even copies of paperwork related to his account and his self-directed IRA's holdings (Exhibit A).

42. Finally, in mid-May 2020, Mr. Lee had a breakthrough, and obtained a copy of the 2017 closing/distribution letter from Equity Trust (Exhibit G).

43. However, the distribution letter did not list the nine (9) lots he had purchased in Montecristo and Seaside Mariana, and instead listed an address in Miami, and a property in Loma Allegre, Mexico.

44. Mr. Lee had never even heard of those two properties listed, much less asked ETC to purchase them on his behalf.

45. Even more strangely, ETC claims to have distributed shares in those two properties, which would only make sense if Mr. Lee had put each of those investments inside an entity (Exhibit G).

46. The distribution letter had lots of other factually incorrect information in it. For example, the letter stated that Mr. Lee had requested the distribution. Per Mr. Lee's Sworn Affidavit (Exhibit A), that is patently false.

47. ETC's distribution letter also states (Exhibit G) that all original documents (such as evidence of title) were sent to Mr. Lee. As per Mr. Lee's affidavit, that too is untrue. Not only did Mr. Lee not receive the documents, but there was no list of documents in the letter.

48. In later verbal questioning, an Equity Trust representative conceded that there apparently were no documents, and they did not know why they had listed an address in Miami and a property and Mexico as ones that they had purchased for Mr. Lee (Exhibit A).

49. Further, Equity Trust has no list of what the documents were or would be, and no copies of them! (Exhibit A, Mr. Lee's recollection as per ETC reps).

50. In another phone call initiated by Mr. Lee, an Equity Trust representative acknowledged that they did not even have records of fully executing the Seaside Mariana purchase and sales contract! (Exhibit A, Sworn Affidavit, and Exhibit I, the partially executed Seaside Mariana contract that ETC had in its records. ETC may have wired hundreds of thousands of dollars to a seller of property not only without obtaining fee simple title, but also without even bothering to make the seller sign the contract, obligating the seller to transfer title to the desired properties)

51. Mr. Lee later obtained digital versions of what ETC had, a fully-executed Montecristo purchase contract with ETC and Jorge Estrada both having signed (Exhibit H), and the half-executed contract for Seaside Mariana signed only by ETC referenced earlier (Exhibit I).

52. In June 2020, ETC representative Ms. Nikki Carroll confirmed by email that ETC had no more documents they could send copies of.

53. Apparently, ETC only had two further documents, the Direction of Investment forms, which ETC has said they cannot provide copies of (Exhibit J).

54. As to the purchases on behalf of Mr. Lee's self-directed IRA, ETC confirmed they wired out $735,000 of Mr. Lee's IRA.

**PLAINTIFF'S [AMENDED] LEGAL COMPLAINT FOR NEGLIGENCE; BREACH OF FIDUCIARY DUTY; WRONGFUL FILING OF AN INFORMATION RETURN; FRAUDULENT MISREPRESENTATION; AIDING AND ABETTING FIDUCIARY BREACH; FRAUDULENT OMISSION; and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

5

55. However, ETC could not confirm executing the second purchase contract, nor could ETC confirm ever receiving title to the nine (9) lots Mr. Lee purchased for that $735,000 for his self-directed IRA (Exhibit A).

56. ETC could not confirm even ever **asking** for title to be transferred in exchange for the $735,000 wired to sellers.

57. Upon information and belief, Equity Trust simply wired the monies in Plaintiff's IRA to the sellers of the lots he wanted to purchase, but ETC representatives did not make sure that Equity Trust Custodian FBO Howard Lee IRA got title to the properties Mr. Lee wished to buy as an investment.

58. In June 2020, the Plaintiff communicated with Nikki Carroll of ETC, pointing out that if ETC had simply wired his monies out, but not obtained title to the real property Mr. Lee wished to invest in through his SD IRA, that the value of his IRA was $0, both in 2007 and 2017 (at the time that ETC closed Lee's IRA without him requesting so, nor any phone calls or other notifications by ETC).

59. However, Ms. Carroll insisted that Mr. Lee's IRA was still worth $735,000, though she could not explain why, except for a claim that Mr. Lee's IRA owned "shares" in properties in Miami and Mexico.

60. Ms. Carroll, on behalf off ETC, insisted that Mr. Lee hire a third-party appraiser to value his IRA's Seaside Mariana and Montecristo lots, if Mr. Lee wished the value of his IRA to be "marked to market." (Exhibit S).

61. To the Plaintiff, this appeared extremely illogical and somewhat fraudulent. ETC could not produce any evidence that it had ever effectuated the title of transfer, but insisted that the IRA, which held no assets, was worth $735,000. Further, ETC insisted that Mr. Lee hire a third-party appraiser (at some expense) to value nothing, zilch, nada.

62. There would be no point in appraising "shares" in two addresses in Miami and Mexico unless ETC had mistakenly purchased the wrong properties for the Plaintiff's IRA.

63. The Estradas did not substantially respond to Mr. Lee.

64. Mr. Lee was stymied by ETC's lack of information, but decided to investigate the situation independently, going to the source of his Nicaraguan investments, and the local land registries to see if his IRA had received title.

65. In May and June 2020, Mr. Lee communicated with attorneys in Nicaragua that he decided to hire, and learned that ETC (on behalf of his IRA) would need to issue a power-of-attorney for a representative in Nicaragua to go to the *municipio* (the local municipality) for "Equity Trust Custodian FBO Howard Lee IRA", and to consult the property registry.

66. In July 2020, Mr. Lee found TCS, a title services company serving Nicaragua, run by Ms. Turalu Murdock, esquire, who is not only an attorney but also used to run First American Title Latin America from Nicaragua (Exhibit K, Ms. Murdock's background).

67. Information on TCS and its services is attached (Exhibit L).

68. In August 2020, Mr. Lee hired Ms. Murdock via TCS, as well as Nicaraguan counsel to confirm that his IRA does not and did not actually own the nine (9) lots that Mr. Lee asked ETC to purchase for him.

**PLAINTIFF'S [AMENDED] LEGAL COMPLAINT FOR NEGLIGENCE;**     6
**BREACH OF FIDUCIARY DUTY; WRONGFUL FILING OF AN
INFORMATION RETURN; FRAUDULENT MISREPRESENTATION;
AIDING AND ABETTING FIDUCIARY BREACH; FRAUDULENT OMISSION;
and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

69.  Obviously, the Plaintiff was hoping his suspicions were wrong, and that the IRA did, in fact, own those properties. The Plaintiff would much rather have confirmed the opposite.

70.  The results of TCS' research were and are, as per the letter by Ms. Murdock, esq. that the Plaintiff's IRA Equity Trust Company Custodian FBO Howard Lee IRA never owned any properties in Seaside Mariana nor in Montecristo (Exhibit M, with the five documents with further detail and specificity attached).

71.  Besides the loss of his $736,000 of principal and fees, the Plaintiff's even more significant loss is the appreciation he should have or would have earned on his investments. For example, even at a low 10% IRR the Plaintiff's US $735k investment in 2007 would be around US $2,791,000 million today.

72.  At a 20% IRR the Plaintiff's $735k investment would be worth approximately US $9,436,000 today.

73.  The Plaintiff has invested significant amounts of his time in attempting to understand what transpired, and to untangle at least part of this mess.

74.  His costs and damages in research are small compared to his other losses, but are worth noting, and shall be further proven at trial:  $900 for Ms. Turalu Murdock's firm's research; $20 for apostilling; $150 for international DHL and priority mail.

75.  Further, Mr. Lee was also overcharged by the Defendant for annual Account Maintenance Fees, based on the following ETC fee schedule (Exhibit Q), as the value of his account has been $0 since ETC lost his entire SDIRA retirement nest egg, to the tune of $6610 (over the years) and $1940 (recently), for a total of $8550 of fraudulent and wrongful customer charges - $9550 if you include the $1,000 ETC charged the Plaintiff not to buy the properties he requested.

76.  Although ETC documentation disclaims fiduciary status in the *selection* of investments, the Plaintiff contends that ETC is a fiduciary in at least the limited sense of ensuring that the funds within its custody are invested as directed.

77.  This is not a case about the negligent selection of an investment; it is specifically a case about ETC's gross failure to consummate an investment transaction with the result that the Plaintiff never obtained the title to land he believed he had invested in.

78.  ETC's response to the apparent discovery of its failure in 2017 was mendacious as well as panicky. ETC proceeded to close out the Plaintiff's IRA without his knowledge or consent and willfully file a false information return.

79.  The 1099 that ETC filed with the IRS set an entirely arbitrary value to the land that ETC had *not* purchased and that the Plaintiff *did not own* due to negligence on the part of ETC. In this case, Equity's fraud contained an embedded fraud like a Matryoshka doll of mendacity.

80.  Equity's 1099 assumed that the unpurchased land had been purchased (but had not appreciated in value) and then ignored the Plaintiff's basis with the result that the Plaintiff was assessed $381,496 in back taxes and penalties by the IRS on top of the conversion of his SIDRA funds.

81.  Those are post-tax dollars, and thus the impact of this upon the Plaintiff will be more than $600,000 in regular currency that the Plaintiff would need to earn to pay off those taxes, penalties, and interest.

**PLAINTIFF'S [AMENDED] LEGAL COMPLAINT FOR NEGLIGENCE; BREACH OF FIDUCIARY DUTY; WRONGFUL FILING OF AN INFORMATION RETURN; FRAUDULENT MISREPRESENTATION; AIDING AND ABETTING FIDUCIARY BREACH; FRAUDULENT OMISSION; and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

7

82. Luckily, upon contacting ETC in October 2020 to see about solutions to solve this situation, ETC agreed to correct that part of the situation, and issue a 2017 1099-R with a value of $0.

83. ETC then did issue the correct 1099-R (Exhibit O), and in November 2020 had the correct asset value of $0 (Exhibit P).

84. However, the Plaintiff has still sustained losses and damages that ETC is responsible for, including charges from the IRS – the most recent bill was over $399,655.87 that the Plaintiff will need to pay (post-tax).

85. The Plaintiff is cautiously optimistic that the IRS will cancel, remove and/or abate the $241,736 of tax owed, the $48,347 of "Substantial Tax Understatement Penalty", and the $60,342 of failure-to-file penalty. The Plaintiff also hopes that the IRS will credit the $31,071 of interest charged so far.

86. Further, the Plaintiff has expended US $5,000 (to be reimbursed) and owes another $35,000 to Scales of Justice, LLC (that ETC can pay directly or indirectly) for the following services, that have likely helped the Plaintiff avoid paying over $399,655.87 (post-tax) in wrongful and erroneous taxes, penalties, and interest at the federal level:

- Successful demands upon ETC to fix wrongful filing of an information return (2017 1099-R).
- Draft legal complaint against ETC for said wrongful filing of an information return
- Tax dispute correspondence with IRS (which also preserved the Plaintiff's rights)
- Correspondence with the Taxpayer Advocate Service (TAS) division of the Internal Revenue Service
- Tax Petition against the Commissioner of the IRS filed in federal Tax Court, to preserve the Plaintiff's rights (which otherwise would have expired November 16th, 2020).

87. The Plaintiff notes that his wise investment of $40,000 in consulting services ($5,000 already paid, with $35,000 still owing) not only saved him over $400,000 in post-tax dollars (US $600k+ in pre-tax dollars he would have had to earn) but likely will also save Defendant ETC the same $400,000 in post-tax dollars that ETC would otherwise have to reimburse/pay as part of the damages for the wrongful, false filing of the information return under 26 USC § 7434.

88. (The Plaintiff is still hoping and expecting that the IRS will reduce his additional tax basis, penalties and interest back down to $0, and hopes and expects that that will occur in 2021. The IRS is still processing the corrected 1099-R).

**PLAINTIFF'S [AMENDED] LEGAL COMPLAINT FOR NEGLIGENCE;**     8
**BREACH OF FIDUCIARY DUTY; WRONGFUL FILING OF AN
INFORMATION RETURN; FRAUDULENT MISREPRESENTATION;
AIDING AND ABETTING FIDUCIARY BREACH; FRAUDULENT OMISSION;
and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

## COUNT I – NEGLIGENCE

89.     Plaintiff realleges paragraphs 1-88 as if fully set out herein.

90.     The Plaintiff notes that his wise investment of $40,000 in consulting services ($5,000 already paid, with $35,000 still owing) not only saved him over $400,000 in post-tax dollars (US $600k+ in pre-tax dollars he would have had to earn) but has also saved Defendant ETC the same $400,000 in post-tax dollars that ETC would otherwise have to reimburse/pay as part of the damages for the wrongful, false filing of the information return under 26 USC § 7434.

91.     As a matter of Colorado and Florida law, ETC as custodian of the Plaintiff's SIDRA owed a duty to the Plaintiff to exercise reasonable care in the disposition of his SIDRA funds. To be clear, the Plaintiff is not complaining that ETC failed to discourage him from investing in land, or even failed to discourage him from entering into the specific transaction at issue. The Plaintiff is alleging that in the disbursal of SIDRA funds, ETC had a fiduciary duty to ensure that the Plaintiff actually acquired the investment assets he directed ETC to obtain. This is the most basic and elementary duty of a custodian.

92.     ETC egregiously breached its duty in at least the following ways:
(a) By failing to exercise reasonable care to ensure that the Plaintiff obtained title to the land in exchange for his $735,000 in payments disbursed by ETC;
(b) By closing out the Plaintiff's account without him requesting such, in aid of an effort to cover up ETC's own gross malpractice as a custodian;
(c) By filing a false, fraudulent, and entirely fabricated information return, e.g., a 1099 for the tax year 2017 for the further purpose of covering up ETC's gross malpractice as a custodian.

93.     The Plaintiff is 65 years old as of the date of this complaint and as such not close to retirement age. By the very nature of an IRA investment generally and the specific nature of this investment, e.g. in land, the Plaintiff would not be expected to closely monitor his investment and the Plaintiff could not have been expected to anticipated, in candor with the Court, such outrageous bungling by ETC. Hence, the loss in this case was discovered by the Plaintiff in May 2020 when he received the assessment of penalties and taxes by the IRS.

94.     The Plaintiff has been damaged by ETC's negligence by losing the funds in his SIDRA; losing his appreciation and return on the land that ETC failed to purchase; and in being wrongfully assessed income tax and penalties on gains fabricated by ETC, as well as interest charged by the IRS, as well as other costs.

95.     The Plaintiff will fully prove his damages at jury trial.

**PLAINTIFF'S [AMENDED] LEGAL COMPLAINT FOR NEGLIGENCE;**                    9
**BREACH OF FIDUCIARY DUTY; WRONGFUL FILING OF AN**
**INFORMATION RETURN; FRAUDULENT MISREPRESENTATION;**
**AIDING AND ABETTING FIDUCIARY BREACH; FRAUDULENT OMISSION;**
**and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

## COUNT II – BREACH OF FIDUCIARY DUTY

96. Plaintiff realleges paragraphs 1-88 as if fully set out herein.

97. As a matter of Colorado and Florida law, ETC as custodian of the Plaintiff's SIDRA owed a fiduciary duty to the Plaintiff to exercise reasonable care in the disposition of his SIDRA funds.

98. To be clear, the Plaintiff is not complaining that ETC failed to discourage him from investing in land, or even failed to discourage him from entering into the specific transaction at issue. The Plaintiff is alleging that in the disbursal of SIDRA funds, ETC had a fiduciary duty to ensure that the Plaintiff actually acquired the investment assets he directed ETC to obtain. This is the most basic and elementary duty of a custodian.

99. ETC egregiously breached its fiduciary duty in at least the following ways:
(a) By failing to exercise reasonable care to ensure that the Plaintiff obtained title to the land in exchange for his $735,000 in payments disbursed by ETC;
(b) By closing out the Plaintiff's account without him requesting such, in aid of an effort to cover up ETC's own gross malpractice as a custodian;
(c) By filing a false, fraudulent, and entirely fabricated information return, *id est*, a 1099 for the tax year 2017 for the further purpose of covering up ETC's gross malpractice as a custodian.

100. The Plaintiff is 65 years old as of the date of this complaint and as such close to retirement age.

101. By the very nature of an IRA investment generally and the specific nature of this investment, *id est*, in land, the Plaintiff would not be expected to closely monitor his investment and the Plaintiff could not have been expected nor anticipated, in candor with the Court, such outrageous bungling by ETC.

102. Hence, the first clue as to something being amiss with ETC was in October 2019 when the Plaintiff received the assessment of penalties and taxes by the IRS.

103. However, the Plaintiff did not confirm the full loss of his entire investment until August 2020 when he was able to confirm that his SDIRA did not hold title to any of the expected investment properties. (To this day, ETC insists that the SDIRA holds title, but refuses to send any evidence of that).

104. The Plaintiff has been damaged by ETC's acts of fiduciary breach by losing the fund in his SIDRA; losing his appreciation and return on the land that ETC failed to purchase; and in being wrongfully assessed income tax and penalties on gains fabricated by ETC.

105. The Plaintiff will prove his full base damages at jury trial.

## COUNT III – FILING A FALSE INFORMATION RETURN

106. Plaintiff realleges paragraphs 1-88 as if fully set out herein.

107. ETC filed a 1099 for the Plaintiff for the tax year showing $735,000 in income from his closed IRA.

108. The 1099 filed by ETC was an Information Return within the meaning of 26 USC § 7434.

**PLAINTIFF'S [AMENDED] LEGAL COMPLAINT FOR NEGLIGENCE;**     10
**BREACH OF FIDUCIARY DUTY; WRONGFUL FILING OF AN
INFORMATION RETURN; FRAUDULENT MISREPRESENTATION;
AIDING AND ABETTING FIDUCIARY BREACH; FRAUDULENT OMISSION;
and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

109. The 1099 was false and known to be false when filed by ETC. ETC only filed the 1099 as part of a scheme to cover up its own outrageous mismanagement and malpractice as a custodian.

110. As a direct result of ETC's filing of the 1099, a false and fraudulent information return, the Plaintiff has been erroneously assessed taxes and penalties.

111. The Plaintiff is honest in his dealings. As a consequential result of ETC's false filing, the Plaintiff has lost profits on business and investment opportunities, as well as opportunities to experience things in life that he had to pass up because of Equity Trust's errors and willful fraud.

112. The Plaintiff will prove his full base damages at jury trial.

## COUNT IV – AIDING AND ABETTING FIDUCIARY BREACH

113. Plaintiff realleges paragraphs 1-88 as if fully set out herein.

114. In connection with the Plaintiff's SDIRA transaction, Sellers owed the Plaintiff a fiduciary duty to transfer title to the land in exchange for the contractual consideration.

115. The Sellers breached their fiduciary duty by accepting the contractual consideration and not transferring title to the land to Plaintiff.

116. The Defendant gave knowing assistance to the Sellers' fiduciary breach by grossly, negligently and/or recklessly failing to ensure that title to the land was transferred to the Plaintiff upon payment of the contractual consideration.

117. As a direct and proximate result of the Defendant's action and inaction, the Plaintiff was damaged in that he lost the contractual consideration ($735,000).

118. The Plaintiff will prove his full base damages at jury trial.

## COUNT V – FRAUDULENT MISREPRESENTATION

119. Plaintiff realleges paragraphs 1-88 as if fully set out herein.

120. The Defendant sent the Plaintiff periodic account statements that reflected substantial value in the Plaintiff's SDIRA account ("Statements of Value").

121. The Statements of Value were materially false in that, as the Defendant knew, the Plaintiff's SDIRA account had no value until or unless title to the Plaintiff's land has transferred.

122. The Defendants intended that the Plaintiff rely on the Statements of Value.

123. The Plaintiff reasonably relied on the Statements of Value.

124. As a direct and proximate result of the Plaintiff's reliance on the Statements of Value, the Plaintiff was damaged in that he was deprived of the opportunity to compel the return of his consideration ($735,000).

**PLAINTIFF'S [AMENDED] LEGAL COMPLAINT FOR NEGLIGENCE;**           11
**BREACH OF FIDUCIARY DUTY; WRONGFUL FILING OF AN**
**INFORMATION RETURN; FRAUDULENT MISREPRESENTATION;**
**AIDING AND ABETTING FIDUCIARY BREACH; FRAUDULENT OMISSION;**
**and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

## COUNT VI – FRAUDULENT OMISSION

125. Plaintiff realleges paragraphs 1-88 as if fully set out herein.

126. Within a short time after the wiring of $515,000 and $220,000 ($735,000) for the two investments ($735,000 total) FBO the Plaintiff's SDIRA, the Defendant would have been aware (or should have been aware) of the highly material fact that Sellers simply took the proceeds from the Plaintiff's SDIRA and did not transfer title (hereafter "the Facts of Sellers' Fraud").

127. The Defendant failed to disclose the Fact of Sellers' Title Fraud. The Defendant may have sent out a document suggesting that the Defendant was "WAITING FOR THE DEED" but the Plaintiff did not receive the documents.

128. Had the Plaintiff receive the documents, the "disclosure" would have been inadequate as a matter of law (and of common sense) as it suggested a mere clerical or administrative delay ("WAITING FOR THE DEED").

129. The Defendant intended that the Plaintiff rely on its omission of the Facts of Sellers' Fraud.

130. The Plaintiff did in fact reasonably rely on the Defendant's omission of the Facts of Sellers' Title Fraud.

131. As a direct and proximate result of the Defendant's omission of the Facts of Sellers' Fraud, the Plaintiff was damaged in that he was deprived of the opportunity to compel the return of his consideration.

## COUNT VII – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

132. Plaintiff realleges paragraphs 1-88 as if fully set out herein.

133. The Defendant, as custodian, owed the Plaintiff a contractual and fiduciary duty to maintain accurate financial records and file accurate tax information returns in relation to his SDIRA.

134. Alternatively and conjunctively, the Defendant owed the Plaintiff a contractual duty to execute all documents necessary to effectuate/consummate any transaction directed by the Plaintiff.

135. The Defendant breached its duty to file accurate information returns resulting in a facial (but legally invalid) tax liability of $600,000 on the part of the Plaintiff.

136. The Defendant conjunctively breached its duty to execute documents necessary to the Plaintiff's purchase of land in his SDIRA by failing to obtain title to the land.

137. Both breaches of duty on the part of the Defendant foreseeably inflicted extreme emotional distress on the Plaintiff.

138. The Defendant's breaches of duty were the proximate cause of the Plaintiff's emotional distress.

PLAINTIFF'S [AMENDED] LEGAL COMPLAINT FOR NEGLIGENCE;          12
BREACH OF FIDUCIARY DUTY; WRONGFUL FILING OF AN
INFORMATION RETURN; FRAUDULENT MISREPRESENTATION;
AIDING AND ABETTING FIDUCIARY BREACH; FRAUDULENT OMISSION;
and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

## Claim for Relief – Declaratory Judgment under C.R.C.P. Rule 57

139. Plaintiff realleges paragraphs 1-88 as if fully set out herein.

140. Defendant ETC continues to invoice Plaintiff Howard Lee, and currently claims that Mr. Lee owes ETC over $9000 (Exhibit R).

141. However, according to ETC's own summary of its charges, the annual maintenance fee for an account with a value of $0 is $0 (Exhibit Q).

142. Similarly, if there are no maintenance fees due, since the IRA is worth $0, Mr. Lee should not be charged late fees on a fee that should never have been charged.

143. Plaintiff is entitled to a declaratory judgment, and hereby requests such, finding that:

    (a) Because ETC lost all $735,000 in his IRA money

    (b) Because ETC bills annual maintenance fees based on account values (Exhibit Q)

    (c) that, contrary to the invoice recently sent to the Plaintiff (Exhibit R), the Plaintiff owes nothing to ETC for annual maintenance fees, nor for late fees.

**PLAINTIFF'S [AMENDED] LEGAL COMPLAINT FOR NEGLIGENCE; BREACH OF FIDUCIARY DUTY; WRONGFUL FILING OF AN INFORMATION RETURN; FRAUDULENT MISREPRESENTATION; AIDING AND ABETTING FIDUCIARY BREACH; FRAUDULENT OMISSION; and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

13

WHEREFORE the Plaintiff prays:

(a) As to Count I for all direct and consequential damages proximately caused by the Defendant's negligence and for the imposition of exemplary damages in an amount sufficient to punish and deter the Defendant from being negligent with its other customers retirement assets (the assets that should have the greatest care and most responsible behavior) in the future;

(b) As to Count II for all direct and consequential damages proximately caused by the Defendant's breaches of fiduciary duty and for the imposition of exemplary damages in an amount sufficient to punish and deter the Defendant from breaching its fiduciary duties in the future;

(c) As to Count III for all direct and consequential damages proximately caused by the Defendant's filing of a false information return as well as for costs, attorney's fees and penalties as provided in 26 USC 7434;

(d) As to Count IV all damages proximately caused by the Defendant's acts of aiding and abetting fiduciary breach as well as the imposition of exemplary damages in an amount sufficient to punish and determine similar wrongful acts in the future.

(e) As to Count V for all damages caused by the Defendant's acts of fraudulent misrepresentations, including the Plaintiff's full expectancy damages and the imposition of exemplary damages in an amount sufficient to punish and deter similar wrongful acts in the future.

(f) As to Count VI for all damages caused by the Defendant's acts of fraudulent omission, including the Plaintiff's full expectancy damages and for the imposition of exemplary damages in an amount sufficient to punish and deter similar wrongful acts in the future

(g) As to Count VII, all damages proximately caused by the Defendant's negligent infliction of emotional distress;

(h) For all costs and fees of this legal complaint, including travel, costs of service and filing, paralegal, legal consultant, and future attorney's fees.

(i) For such other and further relief as the Court deems just.

**PLAINTIFF'S [AMENDED] LEGAL COMPLAINT FOR NEGLIGENCE;**                    14
**BREACH OF FIDUCIARY DUTY; WRONGFUL FILING OF AN**
**INFORMATION RETURN; FRAUDULENT MISREPRESENTATION;**
**AIDING AND ABETTING FIDUCIARY BREACH; FRAUDULENT OMISSION;**
**and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

RESPECTFULLY SUBMITTED

Howard Lee, *pro se*
March 1st, 2021

**PLAINTIFF'S [AMENDED] LEGAL COMPLAINT FOR NEGLIGENCE;
BREACH OF FIDUCIARY DUTY; WRONGFUL FILING OF AN
INFORMATION RETURN; FRAUDULENT MISREPRESENTATION;
AIDING AND ABETTING FIDUCIARY BREACH; FRAUDULENT OMISSION;
and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

15